1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RODDRICK DONNEL BAZEMORE,              No.  2:14-cv-0651-GEB-EFB P (TEMP)

12                Petitioner,

13        vs.

14   H. SHIRLEY, Warden,                    FINDINGS AND RECOMMENDATIONS

15                Respondent.

16

17        Petitioner is a state prisoner proceeding without counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction entered

19   against him on February 9, 2011 in the Solano County Superior Court on four counts of robbery

20   and two counts of attempted robbery, with jury findings that he had suffered two prior strike

21   convictions.  He seeks federal habeas relief on the following grounds: (1) joinder of the robbery

22   and attempted robbery charges in one trial violated his right to due process; (2) the identification

23   procedures conducted in this case were unduly suggestive; and (3) his trial counsel rendered

24   ineffective assistance.  Upon careful consideration of the record and the applicable law, and for

25   the reasons stated below, petitioner's application for habeas corpus relief must be denied.

26   /////

27   /////

28   /////

                                             1

## I. Background

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the First Appellate District provided the following factual summary:

> Roddrick Bazemore appeals from convictions of four counts of robbery and two counts of attempted robbery. He contends that he was prejudiced by consolidation of the cases against him, which arose from four separate incidents; that the pretrial identification procedures used were unduly suggestive; and that there was insufficient evidence to support one of the robbery counts.[1]  We affirm.

> **STATEMENT OF THE CASE**

> On January 20, 2009, a consolidated information was filed with the Solano County Superior Court, charging appellant with four counts of second degree robbery (Pen. Code, § 211)[2] and two counts of attempted second degree robbery (§§ 664/211): robbery of Sally's Beauty Supply (R.M.) on January 24, 2008 (count 1); attempted robbery of Tommy Bahamas (S.K.) on January 30, 2008 (count 2); attempted robbery of Tommy Bahamas (C.C.) on January 30, 2008 (count 3); robbery of Entenmann's Bakery (N.C.) on February 26, 2008 (count 4); robbery of Entenmann's (C.C.) on February 26, 2008 (count 5); and robbery of Fallas (E.M.) on March 4, 2008 (count 6).[3]  It was further alleged that appellant had suffered two prior robbery convictions within the meaning of section 1170.12, subdivisions (a) through (d), section 667, subdivision (b) through (i), and section 667, subdivision (a)(1).[4]

> Appellant was arraigned on January 20, 2009, and entered a plea of not guilty.

> On January 28, 2010, appellant moved to sever the two attempted robbery counts from the robbery counts.  This motion was denied on February 2, the first day of jury trial.  On February 9, the jury found appellant guilty of all the charged offenses; the next day, it found the two prior conviction allegations true.

---

[1]   During the pendency of this appeal, appellant has additionally filed two petitions for writ of habeas corpus raising claims of ineffective assistance of counsel.

[2]   All statutory references are to the Penal Code unless otherwise indicated.

[3]   Counts 1, 2, 3 and 6 were originally charged in case No. SCR253307; counts 4 and 5 were originally charged in Solano County Superior Court case No. FCR253372.

[4]   An amended consolidated information was filed on September 9, 2010, adding enhancement allegations based on two federal convictions.  These enhancement allegations were subsequently stricken by the prosecution on February 10, 2011.

Appellant filed a motion to dismiss the prior strike convictions under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. He also filed a motion for new trial, based on new information provided by the prosecutor's office that appellant claimed would allow him to bolster the third party culpability argument he tried to make at trial.[5]  The new trial motion was denied on May 9, 2011.

On July 17, the court struck one of the priors as to counts 1, 2, 3 and 6, but denied the motion to strike as to counts 4 and 5.[6]  The court then sentenced appellant to a total prison term of 25 years to life, plus 30 years.[7]

Appellant filed a timely notice of appeal on July 31, 2011.

Appellant, in propria persona, subsequently filed two petitions for writ of habeas corpus, the first on July 25, 2012 (case No. A136042) and the second on October 15, 2012 (case No. A136805), which we ordered to be considered with the appeal.

**STATEMENT OF FACTS**

**Sally's Beauty Supply (count 1)**

On January 24, 2008, Rosa Martinez was working at the register at Sally's Beauty Supply in Fairfield.  At about 6:45 p.m., a man Martinez identified at trial as appellant came into the store.  He was wearing a black beanie, black sweatshirt and black jeans, he was clean-shaven and he had a Band–Aid on the upper part of his cheek. The man told Martinez he was looking around and waiting for his wife to come in, walked around for about 10 minutes, then left. Ten or 15 minutes later, he returned, grabbed a brush, came to the

---

[5]  The prosecutor had become aware of three robbery cases involving a different suspect which bore some similarity to the robberies of which appellant was convicted.

[6]  The court explained that appellant was 54 and a half years old and had an "exemplary" record during his more than three years of presentence incarceration, acting as a mentor to others in the jail and battling substance abuse, and earning highly laudatory letters of support from the director of the jail's treatment program.  On the other hand, appellant's more than 30–year history of committing felonies made it "hard" to view him as "outside the scheme of the three strikes law."

[7]  The court sentenced appellant as a three-striker on counts 4 and 5, imposing for each of these counts the indeterminate term of 25 years to life plus 10 years for the two section 667, subdivision (a)(1) priors, with the sentences on these two counts to run concurrently.  On the other counts, as to which the court had stricken one of the prior convictions, the court sentenced appellant as a two-striker: On each of counts 2 and 3, the court imposed aggravated terms of three years, doubled to six years because of the strike, concurrent with each other but consecutive to the indeterminate term; on each of counts 1 and 6, the court imposed one year (one third of the midterm), doubled to two years because of the strike, consecutive to each other and to the other terms imposed.  Finally, the court imposed an additional term of 10 years for the two prior conviction enhancements.

3

register and told Martinez to "stay calm," he was there to rob her. She opened the register and asked "how he wanted [her] to put the money," and he grabbed the money and walked out of the store.

Martinez testified that the store was well lit. When the man first came in, she was talking to him from about six feet away. The second time, she was at the register and he came to the opposite side; initially, they were looking straight at each other, and she thought he was just a customer. As soon as he said he was there to rob her, she looked down and did not look at him again. At this point she was afraid, thinking he might have a weapon or hurt her. The man did not threaten her or mention a weapon. he [sic] amount taken from the register was $370. In addition to describing the clothes he was wearing, Martinez told the police the man was five foot nine inches tall and about 40 years old.

Subsequently, on March 6, the police showed Martinez a single photograph of appellant and she recognized him as the person who robbed her. Martinez recognized that this was a surveillance photograph; as will be explained, it was taken from a surveillance video of a different robbery in which appellant was a suspect. On cross-examination, Martinez acknowledged that when shown the surveillance photograph, she recognized the person's build; asked to acknowledge that she did not recognize the person's face, she testified that she did not remember whether she did or did not. Martinez subsequently identified appellant in a photographic lineup on March 12 and a live lineup on March 27. The forms Martinez signed at these identifications contained admonishments including that the person might or might not be included in the lineup.

Fairfield Detective Steven Trojanowski, who conducted the live lineup, testified that in March 2008, appellant was 51 years old, about six feet tall, and weighed about 210 pounds. At trial, Martinez testified that the hat in exhibit No. 23, which had been seized in a search of appellant's home, was a similar color to the beanie the robber was wearing, but did not look like the beanie because the beanie did not have a bill.

**Tommy Bahamas (counts 2 & 3)**

On January 30, 2008, Sean Kerwin and Christine Corsello were working in a Tommy Bahamas clothing outlet store in Vacaville. At about 8:45 p.m., shortly before closing time, while Kerwin and Corsello were both at the cash registers, a man both identified at trial as appellant entered the store. The man was wearing a heavy black windbreaker-type jacket, had a Band–Aid under one of his eyes, and smelled heavily of marijuana. He asked whether the clothes were the "spring selection" and Kerwin began his routine answer about clothing in the outlet coming from the retail store. Appellant interrupted, saying he did not care, this was "an armed robbery." Corsello testified that appellant leaned forward, hands on the countertop, and said "I just want to let you know I have a gun. Open your register and give me your money." Corsello told appellant that the registers were closed and her keys were in the back. Appellant said they would go to the back. Corsello stumbled

4

over a box as she turned.  She had tried to trip the alarm and appellant said, "You pressed the alarm," and left the store.

Kerwin testified that appellant was in the store for five to ten minutes; Corsello indicated it was a shorter time.  Until appellant said he was there to rob him, Kerwin had thought appellant was just a customer, but once appellant stated his intention, Kerwin became afraid.  He thought appellant said he had a gun, but he did not see one.  Kerwin testified that it was easy for him to see appellant; the store lighting was bright, appellant was no more than three or four feet away from him, and they were facing each other.  Corsello testified that appellant was two to three feet away; she made eye contact with him and he kept looking at both her and Kerwin.  During the incident, Corsello was "very" afraid that she, Kerwin, or one of the people in the store was going to be injured.  She described the robber to the police as about five feet nine inches but commented at trial that she was a bad judge of height.  She testified that he did not look like the store's usual patron, who would be older and heavier.

Corsello testified that on the night of the incident she talked to her regional manager and risk management contact and obtained pictures taken by the surveillance camera, including the two in exhibit No. 20.  She gave some of the pictures to the police.  On March 13, the police showed Corsello a photographic lineup and she was not able to identify anyone "a hundred percent," going back and forth between numbers one and three.  When the officer asked which she was more inclined to pick, she chose number one.  Appellant's photograph was number three.  At a subsequent live line up on March 27, she identified appellant.  Corsello read and followed the instructions at each of the lineups.  Officer Polen testified that appellant was the only person who was in both the live lineup and the photographic lineup Corsello viewed.

Kerwin testified that some time after the robbery, he was shown a still photograph taken from the store's surveillance video.  A week or two after this, he was shown a photographic lineup at the police station and identified appellant's photograph.  Kerwin also attended a live lineup, where he identified someone other than appellant.  Kerwin testified that he was nervous and afraid the people in the lineup could see him, although he was told they could not; he felt intimidated, and he rushed his identification so he could leave.

Vacaville Police Officer Chris Polen testified that a couple of weeks after the live lineup, he contacted Kerwin and showed him a still photo of the lineup he had seen.  Kerwin identified appellant, explaining that he made his selection through a process of elimination.  Polen did not have any of the other witnesses come to the police department after the photographic lineup and live lineup.  He testified that shortly after the robbery, Kerwin said he had started carrying a golf club as a result of what had happened, and Kerwin said after the live lineup that he was scared and intimidated.

Officer Polen explained that he received a video of the attempted robbery,  and  still  photographs  from  the  video,  from  a  loss

5

prevention agent.  He circulated the still photos to other agencies in the county, then received a call from Detective Trojanowski of the Fairfield Police Department, who said he had identified appellant as a potential suspect in the case.  Polen gave Trojanowski the information he had about the Tommy Bahamas case and a subsequent Vacaville robbery at Fallas Paredes.  After appellant was arrested on March 12, Polen used his booking photograph to create a photographic lineup.

In late February or March 2008, Detective Steven Trojanowski searched appellant's home and seized a black leather jacket, a suede jacket, a solid black neck tie, a checkered men's shirt and a "billed beanie type cap" from appellant's bedroom.  He seized these items because in the surveillance photograph from the Tommy Bahamas attempted robbery, appellant was wearing a black beanie type hat with a bill, checkered shirt, black tie and black jacket.  Trojanowski was aware that the victim in the Sally's robbery had described the robber wearing a black sweatshirt and black jeans.  He did not find a black hooded sweatshirt.  Although there were a lot of black pants and, he believed, black jeans, there was "nothing descriptive enough to take as evidence."  Corsello testified that the hat in exhibit No. 23 looked similar to the one appellant was wearing during the attempted robbery.

The surveillance video of the attempted robbery at Tommy Bahamas was played for the jury.

**Entenmann's Bakery (count 4)**

On February 26, 2008, Natalie Caballero and Carol Crane were working at Entenmann's Bakery in Fairfield.  At about five minutes before 7:00 p.m., just before closing time, a man both identified at trial as appellant came in and asked if they had hamburger buns. Caballero testified that he was clean-cut, wearing a dark baseball cap or other hat with a bill, and had a Band–Aid on his face.  The hat was similar to exhibit No. 23.  Crane testified that she saw the man's face clearly, paying attention to it because she noticed the Band–Aid.  Caballero walked over and showed him where the buns were, and he selected some.  Caballero went to the register and started to ring up the purchase as appellant stood across from her. When the register drawer opened, appellant leaned over, pushed Caballero aside and took the money, about $166, from the register. Appellant said something to the effect that he was going to rob her. Caballero tried to push the drawer closed to get appellant's hands out of it, and appellant said, "Don't trip," then looked at Crane, said he had a gun, took the money and bag of buns, and left.  Caballero testified that during the incident she was afraid appellant might have a gun and she might be hurt.  Crane testified that she did not feel fear but was angry.  When appellant said he was going to rob them, Crane was going to call 911, but as she started going to the back room, Caballero told her not to.  Asked if she intended to call 911 absent Caballero's admonition, Crane stated that she intended to take a bar that was nearby and "beat the hell out of him for what he was doing to us.  He violated us."  Crane testified that appellant

was trying to take the money against her will, that she was threatened, and that he was trying to intimidate her.

When Crane called 911 after appellant left the store, she described him as an African American male wearing black clothing. She at first said he had a Band–Aid above his eye, then said it was below his eye. Crane, who is nearsighted, acknowledged that she was not wearing her glasses at the time of the robbery, but testified that while she could not see small details from a distance, she needed her glasses mostly for driving; she was able to identify the person sitting next to the prosecutor from the witness stand without her glasses. Caballero told the police that the robber looked about 30 years old.

Caballero remembered someone coming to show her photographs sometime after the robbery, but did not remember whether it was one photograph or five or six; when shown the surveillance photograph (exhibit No. 24) and photographic lineup (exhibit No. 11) at trial, she did not remember seeing the former but thought she remembered the latter and recognized her signature on it. She subsequently attended a live lineup and identified appellant. Crane also did not remember whether she was shown the single surveillance photograph. She remembered being shown a photographic lineup and saw her signature on exhibit I No. 3. She remembered being able to identify someone in the photographic lineup and in a live lineup.

Detective Trojanowski testified that he showed the surveillance photograph he had received from Vacaville to the witnesses in the Entenmann's and Sally's robberies on March 6, 2008. When he learned appellant's name as a possible suspect, he prepared a photographic lineup including appellant's photograph and five others with similar physical characteristics. He showed this lineup to Caballero and Crane, separately, on March 12, after reading each the admonishment on the lineup forms and ascertaining that they understood it. Caballero and Crane each said that number two "looks like" the robber but she was not a hundred percent sure, and that number two "could be" the person who committed the robbery.

**Fallas Paredes (count 6)**

On the evening of March 4, 2008, Teresa Jackson and Elaine Marinucci were working at Fallas Paredes in Vacaville. A man came in whom Marinucci identified at trial as appellant. Jackson described the man as African American, about five feet eight or nine inches tall, weighing in "the two hundreds," wearing a sweater and a black beanie. Marinucci testified that the man was in his 40s or 50s and was wearing a dark knit beanie and blue or black athletic pants, and a gray tee shirt, and he had a key ring around his neck.

Marinucci was at the register when appellant entered the store. Jackson greeted him and testified that he said he was looking for his wife. Jackson went to the back of the store and appellant came to the counter and asked for change for the pay phone. Marinucci thought this was "funny" because he already had two dimes and a

nickel, but asked her for quarters.  She had an "inner feeling" that "just didn't feel right."   She opened the register to give him the change, and he reached over the counter and grabbed money from the register.  She put her hand on his hand and he reached over with his hand in his pocket and told her, "Chill, man.  I have a gun."  She let go, not wanting to risk getting shot if he had a gun.  She thought he could have a gun because he kept one hand in his pocket and she saw a "big bulge."  He told her not to call the police and ran out the door.  Jackson came out of the office to see the man leaving the store with money in his hand.

Jackson was in the back during the robbery and was not in fear until after it happened.  She told the police the man was 35 or 40 years old, and that his face was shaved, possibly with "little specks coming in" but nothing around his mouth.

Marinucci recognized exhibit No. 15 as the photo lineup she was shown by the police.  She testified that she identified appellant in the lineup, although exhibit No. 15 bears no mark indicating an identification.  She identified appellant in a live lineup a few days later.

Jackson first testified that she did not remember being shown a series of photographs, then, when shown the photographic lineup in exhibit No. 17, testified that she saw it but did not remember being able to identify anyone.  She testified that if she had identified anyone, she was being honest.  She attended a live lineup, which she remembered because she did not want to do it.  She explained to the police, as she had when shown the photographs, that she did not know exactly what the robber looked like, having only greeted him while rushing to get her job done and go home.  Following instructions that directed her to put a question mark on the lineup form if she saw someone similar to the robber but she was not positively sure, she put a question mark on number 2.

Officer Polen, who created the photographic lineup in exhibit No. 17 using appellant's March 12 booking photo, testified that appellant's photo was in the number three position.  When Officer Polen showed the lineup to Jackson on March 13, she went back and forth between numbers one and three, but settled on number three.   Polen testified that he always asked witnesses if they understood the admonitions he gave before showing a lineup, and would not show a lineup if the witness did not understand the admonitions.  Jackson was "pretty confident" about her selection, but asked to view a live lineup to be sure of her identification, and attended the lineup on March 27.

Toward the beginning of Jackson's testimony, the prosecutor commented that she kept looking to the prosecutor's left and asked why.   Jackson said she was "just looking around" and "just nervous."  Jackson acknowledged that she had been subpoenaed to appear in court the preceding Tuesday, but did not appear that day, Wednesday or Thursday; then she received a call telling her she might get in trouble if she did not come.

8

**Defense**

Mitchell Eisen, Ph. D., testified as an expert on eyewitness identification, memory and suggestibility.  He testified that, according to the research, in traumatic situations, stress overwhelms coping mechanisms and people tend to focus on key elements of the event, limiting the information taken in.  Longer exposure to a person will generally increase the chance of a witness being able to differentiate the person from others later.  Reports given closer in time to the event tend to be more complete and accurate, both because the information is "fresher" and because such reports are less influenced by post-event information from seeing pictures, talking with others and imagining the event.

According to Eisen, it is well understood that when given an identification task such as a lineup, a person will assume the police know something and the suspect is likely there.  This is why a standard admonishment is given directing the witness not to assume the guilty party is present, but the admonishment will not necessarily outweigh the assumption.  Often, witnesses who do not immediately recognize anyone in a lineup will stick with the task, comparing the options and choosing the one who most closely matches their memory, even if the actual perpetrator is not among the choices.   Research has also demonstrated that a person's memory for a face cannot be tested more than once without the potential for that exposure to influence future identifications: Once a witness has been exposed to a person's face, that face will be familiar to the witness and the witness may pick it in a subsequent identification simply for that reason.   Additionally, the officer conducting the identification procedure may inadvertently give cues to the witness.   More errors in identification occur where the witness is of a different race than the perpetrator.

Eisen further testified that research demonstrates people tend to stick with their initial identification in future ones, striving for consistency and searching for the previously identified person.  The identified person becomes the face of the perpetrator in the witness's mind, overriding the witness's memory of the actual event.  Where the initial identification was mistaken, the witness may confuse the identified face with the face of the actual perpetrator.  A person's confidence in his or her identification is not related to accuracy, and people tend to become more certain about their identifications over time regardless of whether the identifications were accurate and even if the initial identification was tentative.  Also, over time the witness may be exposed to information that is interpreted as confirming the identification, such as learning someone else identified the same person.  Research shows that a person's confidence in his or her identification can be artificially boosted or undermined by giving feedback indicating the choice was correct or incorrect.

*People v. Bazemore*, No. A132865, 2013 WL 3778353, at **1-6 (Cal. 1st Div. July 17, 2013).

/////

1  **II.  Standards of Review Applicable to Habeas Corpus Claims**

2          An application for a writ of habeas corpus by a person in custody under a judgment of a

3  state court can be granted only for violations of the Constitution or laws of the United States.  28

4  U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

5  application of state law.  *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502

6  U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

7          Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

8  corpus relief:

9              An application for a writ of habeas corpus on behalf of a
              person in custody pursuant to the judgment of a State court shall not
10             be granted with respect to any claim that was adjudicated on the
              merits in State court proceedings unless the adjudication of the
11             claim -

12                 (1) resulted in a decision that was contrary to, or involved
                  an unreasonable application of, clearly established Federal law, as
13                 determined by the Supreme Court of the United States; or

14                 (2) resulted in a decision that was based on an unreasonable
                  determination of the facts in light of the evidence presented in the
15                 State court proceeding.

16         For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

17  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

18  *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

19  ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v.*

20  *Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining

21  what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*,

22  633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

23  precedent may not be "used to refine or sharpen a general principle of Supreme Court

24  jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  *Marshall*

25  *v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155

26  (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so

27  widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

28  be accepted as correct.  *Id.*  Further, where courts of appeals have diverged in their treatment of

1    an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

2    *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

3          A state court decision is "contrary to" clearly established federal law if it applies a rule

4    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

5    precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

6    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

7    writ if the state court identifies the correct governing legal principle from the Supreme Court's

8    decisions, but unreasonably applies that principle to the facts of the prisoner's case.[8]  *Lockyer v.*

9    *Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002

10   (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

11   court concludes in its independent judgment that the relevant state-court decision applied clearly

12   established federal law erroneously or incorrectly.  Rather, that application must also be

13   unreasonable."  *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473

14   (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

15   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

16   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

17   'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v.*

18   *Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

19   Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

20   must show that the state court's ruling on the claim being presented in federal court was so

21   lacking in justification that there was an error well understood and comprehended in existing law

22   beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S. at 103.

23          If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

24   court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*,

25   527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

26   _____

27        [8]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding."  *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,
28   384 F.3d 628, 638 (9th Cir. 2004)).

1    (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

2    § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

3    considering de novo the constitutional issues raised.").

4          The court looks to the last reasoned state court decision as the basis for the state court

5    judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  If

6    the last reasoned state court decision adopts or substantially incorporates the reasoning from a

7    previous state court decision, this court may consider both decisions to ascertain the reasoning of

8    the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

9    a federal claim has been presented to a state court and the state court has denied relief, it may be

10   presumed that the state court adjudicated the claim on the merits in the absence of any indication

11   or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99.  This presumption

12   may be overcome by a showing "there is reason to think some other explanation for the state

13   court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

14   Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

15   expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

16   the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___, ___, 133

17   S.Ct. 1088, 1091 (2013).

18         Where the state court reaches a decision on the merits but provides no reasoning to

19   support its conclusion, a federal habeas court independently reviews the record to determine

20   whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.*

21   *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

22   review of the constitutional issue, but rather, the only method by which we can determine whether

23   a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.  Where no

24   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

25   reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

26         A summary denial is presumed to be a denial on the merits of the petitioner's claims.

27   *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

28   just what the state court did when it issued a summary denial, the federal court must review the

1  state court record to determine whether there was any "reasonable basis for the state court to deny

2  relief." *Richter*, 562 U.S. at 98.  This court "must determine what arguments or theories ... could

3  have supported, the state court's decision; and then it must ask whether it is possible fairminded

4  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

5  decision of [the Supreme] Court." *Id.* at 102.  The petitioner bears "the burden to demonstrate

6  that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d

7  925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

8        When it is clear, however, that a state court has not reached the merits of a petitioner's

9  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

10  habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

11  F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

12  **III.  Petitioner's Claims**

13        **A.  Improper Joinder**

14        Petitioner claims in his first ground for relief that the trial court violated his due process

15  right to a fair trial when it denied his motion to sever the two counts of attempted robbery at the

16  Tommy Bahama store from trial on the remaining counts of robbery.  ECF No. 1 at 6, 13; ECF

17  No. 18 at 4.[9]  He argues that consolidating the attempted robbery and the robbery counts in one

18  trial "bolster[ed] the weaker counts with a stronger one" and "dramatically increase[d] prejudice."

19  *Id.* at 5.

20        The California Court of Appeal denied this claim, reasoning as follows:

21          Appellant contends the trial court abused its discretion in
   consolidating trial of the four incidents in this case.  In appellant's

22  view, the attempted robbery at Tommy Bahamas was a much
   stronger case against him than the other three incidents.  The

23  attempted robbery was captured on a surveillance video, depicting
   the perpetrator wearing clothing that matched clothing later seized

24  from appellant's bedroom.  By contrast, appellant was connected to
   the three robberies solely by eyewitness testimony which appellant

25  characterizes as "not particularly strong."  Appellant argues that
   consolidation was prejudicial because it allowed the three weaker

26  cases to be bolstered by the stronger case, and because appellant

27

28        [9]  Page number citations such as this one are to the page numbers reflected on the court's
   CM/ECF system and not to page numbers assigned by the parties.

was prosecuted for several offenses rather than a single one. Additionally, appellant urges that because all the incidents were "garden variety" robberies of commercial businesses, with no distinctive features, evidence of the incidents would not have been cross-admissible on issues of identity or modus operandi if they had been tried separately, and that little economy was gained by trying the cases together.

As indicated above, appellant was initially charged in two separate cases, one concerning the attempted robberies at Tommy Bahamas and the robberies of Sally's and Fallas (case No. SCR253307) and the other concerning the robbery of Entenmann's (case No. FCR253732).  Prior to the preliminary hearing, the prosecution moved to consolidate the two cases.  In opposition, appellant argued that consolidation would be prejudicial and improper because it was unlikely any evidence would be cross-admissible, trying multiple cases based only on eyewitness testimony together would bolster relatively weak individual cases, and the evidence from one robbery had nothing to do with the others.  The motion to consolidate was denied, the court expressing particular concern about the fact that different witnesses described the suspect having a Band Aid in different places on his face, which the court felt could easily confuse the jury, and prejudice appellant, because of the "difficulty of keeping that sort of significant factor related to eyewitness testimony separated from one case to the next."

After the prosecution filed the information in case No. SCR253307, appellant moved to sever the counts of attempted robbery (Tommy Bahamas) from the counts of robbery (Sally's and Fallas).  He argued that evidence would not be cross-admissible on the question of identity because the incidents were not sufficiently similar in terms of description of the suspect or method used and there was no common physical evidence; the stronger evidence of the attempted robbery, which included the surveillance video and clothing seized from appellant's home, would bolster the robbery cases, which depended only on imperfect eyewitness testimony; and the similarity of the charges and number of witnesses created a danger of juror confusion.

The prosecution countered that there was cross-admissible evidence in that appellant was identified as a suspect through evidence from both the Fairfield and Vacaville incidents and the Sally's and Tommy Bahamas incidents both involved an unarmed suspect with a Band Aid on his face engaging the employees in small talk before demanding money from the register, and that while the Tommy Bahamas evidence may have been stronger, the other cases were not weak.  The prosecution also sought reconsideration of the order denying consolidation with the Entenmann's robbery charges, for the same reasons it opposed the motion to sever.

The court denied the motion to sever, finding a "high likelihood of cross-admissibility of at least some evidence" and "numerous similarities common to these events," including "similar descriptions of the suspect and how the suspect acted during the events, proximity and time among all three of the events,

similarities in time of day.  None of the crimes is particularly more inflammatory than any other.  There are other features such as the Band–Aid which is common to two out of those three cases."  The court noted that there were at least two common police witnesses, and no "gross difference in the relative strength of any one crime, event, or count over any of the others."  Although it recognized that the surveillance photographs would be of significance to the trier of fact, the court found they would not cause the level of disproportionate weight that would make it unfair to proceed in a single trial.

The court made similar findings regarding the motion to consolidate: "We have similar descriptions of the suspect and how the suspect acted in all four cases.  We have the band-aid on the face, somewhere on the face, appearing in three out of four of the cases.  We have similar descriptions of . . . how the suspect acted and how the suspect in each of the four events committed the actual robbery."  Finding a "high likelihood" of cross-admissibility of evidence among the four cases, and noting the presumption in favor of consolidation absent a showing of undue prejudice to the defendant, the court granted the motion to consolidate.

Just before the beginning of the trial, appellant again moved to sever the two attempted robbery counts.  In addition to previously raised points, appellant maintained that in order to make his strongest argument that the identifications in the Sally's and Entenmann's cases were tainted - because the witnesses were shown the surveillance photograph from the Tommy Bahamas case - the defense would have to concede that the photograph was appellant, which would ensure a guilty verdict on the Tommy Bahamas counts in a joint trial.

In denying appellant's motion to sever the attempted robbery counts, the court (a different judge this time) stated that the surveillance video was "strong evidence" but was "somewhat offset" by Kerwin's "equivocations" about who came into the Tommy Bahamas store and Corsello's having picked two photographs from the lineup.  The court also felt the other cases were not weak, as all involved eye witnesses who were physically close to the suspect and identified appellant.  The court stated there were "some common characteristics" and "[t]here conceivably is cross-admissibility, at least as to the Band–Aid, the gun, or lack thereof."  It continued, "And as to the issue of identity, we could argue a little bit more about whether or not those are signature characteristics or not . . . .  [¶]  But in terms of common plan or scheme or intent, you know, less of a signature quality is required for those kinds of - that kind of evidence to be crossly admissible."  Finally, the court noted that the severance motion "should have been raised sooner," when the video "became of knowledge to both sides."

"Under section 954, '[a]n accusatory pleading' may charge 'two or more different offenses of the same class of crimes or offenses, under separate counts.'"  (*People v. Elliott* (2012) 53 Cal.4th 535, 551.)  "The law favors the joinder of counts because such a course

15

of action promotes efficiency. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.)" (*People v. Myles* (2012) 53 Cal.4th 1181, 1200.)   Accordingly, "[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." (*People v. Soper* (2009) 45 Cal.4th 759, 773 (*Soper*).)   "A trial court has discretion to order that properly joined charges be tried separately (§ 954), but there must be a 'clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion' (*People v. Mendoza* (2000) 24 Cal.4th 130, 160).  In assessing a claimed abuse of discretion, we assess the trial court's ruling by considering the record then before the court. (*Soper, supra*, at p. 774; *People v. Avila* (2006) 38 Cal.4th 491, 575.)" (*People v. Myles, supra*, 53 Cal.4th at p.1200.)

In exercising its discretion to order separate trials, "a trial court should consider (1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether some of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case.  (*People v. Cook* (2006) 39 Cal.4th 566, 581.)" (*People v. Elliott, supra*, 53 Cal.4th at p. 551.)   "If the evidence underlying each of the joined charges would have been cross-admissible under Evidence Code section 1101 had they been prosecuted in separate trials, 'that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' (*Soper, supra*, 45 Cal.4th at p. 775; *see People v. Vines* (2011) 51 Cal.4th 830, 855.)" (*People v. Myles, supra*, 53 Cal.4th at pp. 1200–1201.)

However, "lack of cross-admissibility is not dispositive of whether the court abused its discretion in denying severance.  (§ 954.1; *People v. Thomas* (2011) 52 Cal.4th 336, 350 ['When two crimes of the same class are joined, cross-admissibility is not required.'].)" (*People v. Myles, supra*, 53 Cal.4th at p. 1201.)   Even if the evidence would not have been cross-admissible, the reviewing court must determine "'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' (*People v. Bean* (1988) 46 Cal.3d 919, 938; *see People v. Thomas, supra*, 52 Cal.4th at p. 350.)" (*People v. Myles*, at p. 1201.)   After consideration of all the factors bearing on joinder, the court must ""balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state." [Citation.]'" (*Ibid.,* quoting *People v. Thomas* (2012) 53 Cal.4th 771, 798–799.)

Appellant devotes substantial argument to his claim that the evidence of the separate robberies and attempted robbery would not have been cross-admissible.  Evidence that a defendant committed other crimes may be admissible when relevant to prove a fact such as motive, opportunity, intent or identity (Evid. Code, § 1101, subd. (b)), but only when the offenses are sufficiently similar to prove the

fact at issue.  "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.  (*People v. Miller* [ (1990) ] 50 Cal.3d 954, 987.)  'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.'  (1 McCormick [on Evidence (4th ed. 1992) ] § 190, pp. 801–803.)"  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.)  "The highly unusual and distinctive nature of both the charged and uncharged offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense."  (*People v. Balcom* (1994) 7 Cal.4th 414, 425.)

A lesser degree of similarity is required where the uncharged offenses are used to establish the existence of a common design or plan: For this purpose, "the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual."  (*People v. Ewoldt, supra*, 7 Cal.4th at p. 403.)  Other crimes evidence is admissible to show a common design or plan, however, "only to prove that the defendant engaged in the conduct alleged to constitute the charged offense, not to prove other matters, such as the defendant's intent or identity as to the charged offense."  (*Ibid.*)  Where it is undisputed that the charged offense was committed by someone, and the only question is whether the defendant was the perpetrator, evidence sufficient to demonstrate a common plan but not distinctive enough to establish identity generally would not admissible because it would be cumulative and unduly prejudicial.  (*Id.* at p. 406.)

Appellant urges that the offenses with which he was charged were "garden variety type robberies," none involving common features that were sufficiently distinctive to make them admissible.  This characterization downplays the overall similarities between the incidents: All occurred in a relatively small geographical area, within less than six weeks of each other, at similar times of day, perpetrated by a man wearing dark clothing and a beanie or billed cap who engaged in small talk with an employee, then came to the register, gave the impression or stated he was armed but in fact was not, and, when the register was opened, grabbed the money and left. In three of the four incidents, the perpetrator was described as having a Band–Aid on his upper cheek (although Crane initially told the 911 operator the Band–Aid was above his eye, then said it was below his eye).

We need not determine whether the evidence would have been cross-admissible because, as indicated above, even if it was not, the lack of cross-admissibility would not necessarily mean the trial court abused its discretion in denying severance.  (*People v. Myles, supra*, 53 Cal.4th at p. 1201.)  Here, consideration of the other factors bearing on severance demonstrates that it did not.

17

Two of the remaining factors clearly militate in favor of consolidation.  None of the charges was likely to unusually inflame the jury against the defendant (*People v. Myles, supra*, 53 Cal.4th at p. 1202), as the charged offenses were of the same type, with similar facts and no egregious circumstances in any of the four incidents.  And none of the charges involved a capital offense. (*Ibid.*)  The only real question is whether the joint trial permitted weak charges to be bolstered by strong ones.

This is the heart of appellant's argument - that the attempted robbery counts were supported by strong evidence in the form of the surveillance video and clothing seized from his home, while the robbery charges were weak because they rested purely on eyewitness testimony that appellant challenges as tainted and unreliable.  The trial court disagreed, finding that although the video was strong evidence, the cases based solely on eyewitness testimony were not weak because the witnesses were close to appellant during the incidents and identified him on multiple occasions.

We find no abuse of discretion.  As will be discussed in the following section of this opinion, appellant's challenges to the eyewitness testimony are unavailing.  All of the witnesses were in close contact with the perpetrator during the incidents.  All but one (one of the two witnesses in the Fallas robbery) identified appellant at trial.  All the witnesses in the Sally's, Entenmann's and Fallas robberies identified appellant in both the photographic and the live lineups.  The only witnesses who did not identify appellant in one of the two pretrial identification procedures were the witnesses in the Tommy Bahamas attempted robbery (the incident captured on video), one of whom picked a different person in the photographic lineup (but identified appellant in the live lineup) and the other of whom picked someone different at the live lineup (but identified appellant in the photographic lineup and in a still photograph of the live lineup).  The defense at trial tried to undermine the credibility of these identifications; the various factors bearing on the witnesses' ability to accurately perceive and remember the events, and the opportunities for mistakes, were pointed out on cross-examination, through expert testimony and in argument.  We find no reason to believe the jury would not have credited the eyewitness testimony if it had not also had the benefit of the surveillance video and clothing from the Tommy Bahamas case.  "[T]he benefits of joinder are not outweighed - and severance is not required - merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried.  (E.g., *Zafiro v. United States* (1993) 506 U.S. 534, 540 ["[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials"]; *accord*, [*State v.] Richards* [ (Mont. 1995) ] 906 P.2d 222, 227.)"  (*Soper, supra*, 45 Cal.4th at p. 781.)

Finally, we must consider the benefits to the state from jointly trying these cases.  (*People v. Myles, supra*, 53 Cal.4th at p. 1201.) In addition to the case-specific benefits that accrue when there is an overlap in the evidence pertaining to the joined counts (*Soper,*

18

*supra*, 45 Cal.4th at p. 783), such benefits include conserving judicial resources and public funds: "A unitary trial requires a single courtroom, judge, and court attaches. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried. In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process." (*People v. Bean [,supra,*] 46 Cal.3d [at pp.] 939–940; *Soper, supra*, 45 Cal.4th at pp. 781–783.) "Manifestly, severance of properly joined charges denies the state the substantial benefits of efficiency and conservation of resources otherwise afforded by section 954." (*Soper, supra*, 45 Cal.4th at p. 782.)

Appellant relies upon *People v. Earle* (2009) 172 Cal.App.4th 372 (*Earle*) to argue these benefits are minimal in the present case. *Earle* found a prejudicial abuse of discretion in the refusal to sever two "entirely distinct and dissimilar" cases with "no apparent historical connection to one another," one a very strong (indeed, "tacitly conceded") misdemeanor indecent exposure case and the other a "considerably stronger" felony sexual assault. (*Id.* at p. 378.) The indecent exposure occurred in broad daylight, the victim recorded the perpetrator's license plate, which belonged to the defendant's car, and the victim identified the defendant from a properly conducted photographic lineup. (*Ibid.*) The sexual assault, on the other hand, happened at night in a car lit only by overhead parking lot lights, the victim's description of her assailant differed markedly from the defendant's appearance,[10] there were discrepancies regarding the victim's description of the car involved in the incident and the defendant's car, and the defendant was "a world-class competitor in the sport of 'submission grappling,'" yet during the incident, the victim was able to break her assailant's grasp and escape from the vehicle in which he was trying to subdue her. (*Earle, supra*, 172 Cal.App.4th at pp. 378–379.) Although the indecent exposure was not relevant to any issue in the trial of the assault, the prosecutor explicitly asked the jury to convict the defendant of the assault based on his commission of the unrelated indecent exposure, likening the latter to DNA evidence and "'modus operandi'" despite the absence of any evidence that a person who engages in indecent exposure has a propensity or predisposition to commit a sexual assault. (*Id.* at pp. 379, 398–400.)

---

[10]   The victim described her assailant as looking Mexican, with "light brown skin resembling her own," whereas the defendant was described by a police officer as "white," had a "pallid, European appearance" in photographs, and apparently looked European to the victim of the indecent exposure, as indicated by the photographs in a lineup resulting from her description; she described the assailant as "skinny" while the defendant had an "athletic build"; and the victim did not describe notable physical characteristics of the defendant, including "a deeply furrowed brow and protruding, possibly damaged ears" and "an unmistakably athletic bull neck." (*Earle, supra*, 172 Cal.App.4th at pp. 378–379.)

19

Considering the many significant weaknesses in the assault case - which the court took pains to detail at great length - and the bias against the defendant likely instilled in the jury by the virtually conceded indecent exposure and the prosecutor's "pervasive reliance upon it" (*Earle, supra*, 172 Cal.App.4th at pp. 401–407, 409), as well as the absence of any overlap in evidence or witnesses, the *Earle* majority held that the "systemic economies" of joint trial could not "counterbalance the very substantial risk that evidence of the indecent exposure played a dispositive role in the verdict on the assault charge." (*Id.* at p. 408.)

The present case involves nothing like the extreme disparity in strength between the cases for which severance was sought in *Earle*: As we have said, while the evidence in the Tommy Bahamas case was strengthened by the surveillance video and seized clothing, the eyewitness testimony in the other cases was still strong.  Nor does the present case present the risk of irrelevant emotional bias that drove the court's analysis in *Earle*.  Even the *Earle* court highlighted the systemic benefits resulting from a joint trial, stressing their importance although finding them overcome, in that case, by the defendant's right to a fair trial, without the jury hearing otherwise inadmissible and inflammatory evidence. (*Earle, supra*, 172 Cal.App.4th at pp. 408–409.)  Here, there is no comparable risk of prejudice to outweigh the benefits of a joint trial.

*Bazemore*, 2013 WL 3778353, at **6-12.

The question presented in this federal habeas corpus petition is whether the state appellate court's adjudication of this issue resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law.  Federal habeas relief is appropriate for claims of improper joinder only where the "simultaneous trial of more than one offense . . . actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process."  *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000) (quoting *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991)).  *See also Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).  As the United States Supreme Court has explained, "[i]mproper joinder does not, in itself, violate the Constitution."  *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986).  "Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  *Id.*  "The requisite level of prejudice is reached only if the impermissible joinder had a "substantial and injurious effect or influence in determining the jury's verdict."  *Davis*, 384 F.3d at 638 (quoting *Sandoval*, 241 F.3d at 772).

20

1    A trial court has broad discretion in ruling on severance motions. *Herd v. Kincheloe*, 800

2    F.2d 1526, 1529 (9th Cir. 1986). The relevant factors are judicial economy and prejudice. *United*

3    *States v. Lewis*, 787 F.2d 1318, 1320 n.3 (9th Cir.), *amended* 798 F.2d 1250 (9th Cir. 1986). A

4    reviewing court must consider: (1) whether strong evidence of one count is presented with

5    relatively weak evidence on another count; (2) whether the evidence of the other count is cross-

6    admissible; and (3) whether the state trial court admonished the jury as to the limited use of the

7    other crimes evidence. *See Bean v. Calderon*, 163 F.3d 1073, 1084-86 (9th Cir. 1998). Even if

8    the evidence is not cross-admissible, joinder generally does not result in prejudice if the evidence

9    of each crime is simple and distinct and the jury is properly instructed so that it may

10   compartmentalize the evidence. *Id.* at 1085-86; *see also United States v. Johnson*, 820 F.2d 1065,

11   1071 (9th Cir. 1987).

12    Under the circumstances of this case, the trial court did not abuse its discretion in denying

13   petitioner's severance motion. As the state appellate court found, the evidence on all counts

14   against petitioner was relatively strong and some of the evidence on all of the charges was cross-

15   admissible. Even assuming *arguendo* that the state trial court erred in denying petitioner's

16   motion for severance, the misjoinder did not have a "substantial and injurious effect or influence

17   in determining the jury's verdict." *Davis*, 333 F.3d at 991 (quoting *Sandoval*, 241 F.3d at 772).

18   Nor did the trial court's failure to sever the Tommy Bahama counts "actually render [his] state

19   trial fundamentally unfair." *Featherstone*, 948 F.2d at 1502. *See also Herring v. Meachum*, 11

20   F.3d 374, 377 (2nd Cir. 1993) ("In considering whether a violation of due process occurred, the

21   emphasis must be on the word 'actually.'"). The crimes charged against petitioner were clearly

22   distinct and the jury should have been easily able to distinguish the evidence introduced with

23   respect to one charge from that introduced in the others. There is no evidence that the jury was

24   confused or was unable to consider separately the evidence which pertained to each charged

25   crime. The evidence supporting petitioner's convictions was not materially unequal, none of the

26   offenses was significantly more inflammatory than the other, and there was sufficient evidence to

27   support a conviction of each offense without use of evidence introduced in connection with the

28   other.

1    The court also notes that the United States Supreme Court has never squarely held that a

2    trial court's failure to provide separate trials on different charges implicates the defendant's right

3    to due process of law.  *See Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010) (rejecting the

4    petitioner's argument that *Lane* provides "clearly established federal law" governing a state

5    court's denial of a motion to sever the trials of defendants who present mutually antagonistic

6    defenses); *Runningeagle v. Ryan*, 686 F.3d 758, 776-77 (9th Cir. 2012) (same).  Thus, petitioner

7    cannot show that the state court decision denying his claim of improper severance is contrary to

8    or an unreasonable application of United States Supreme Court authority.  "[I]t cannot be said

9    that a state court unreasonably applied clearly established Federal law" when Supreme Court

10   precedent "give[s] no clear answer to the question presented." *Wright v. Van Patten*, 552 U.S.

11   120, 126 (2008) (internal quotation marks and alterations omitted).

12   Accordingly, for all of the foregoing reasons, petitioner is not entitled to relief on his

13   claim of improper joinder.

14       **B.  Identification Procedures**

15   In his second ground for relief, petitioner claims that unduly suggestive pretrial

16   identification procedures violated his right to due process and a fair trial.  ECF No. 1 at 13-14;

17   ECF No. 17-9 at 120-27.  He argues that trial witnesses Martinez, Caballero and Crane may have

18   identified him at the photographic and live lineups only because they were previously shown a

19   still photograph of him that had been extracted from the Tommy Bahama surveillance video.

20   ECF No. 17-9 at 121; ECF No. 18 at 6.  He argues his face was "familiar" to these witnesses

21   because they had seen his photograph prior to the lineups.  ECF No. 18 at 6.  Petitioner contends

22   that "the showing of suspects singly to a witness for identification is '[o]ne of the most

23   condemned pretrial identification procedures.'"  ECF No. 17-9 at 121.

24   Petitioner also notes that witnesses Caballero and Crane identified him at a live lineup

25   after they had seen both the photograph from the Tommy Bahama surveillance video and a photo

26   lineup containing his photograph.  *Id.* at 123.  Petitioner states that he was "the only person who

27   was included in both the photo lineups, and the live lineup." *Id.*  He argues this fact contributes

28   to the suggestive nature of the identifications that occurred in this case.  Petitioner explains:

1
2
3
4

> Here, the witnesses were shown a still photo which came from a surveillance video.   Later, they were shown a photo lineup containing [petitioner's] picture, and later still, were asked to identify [petitioner] from a live lineup in which all the subjects were wearing jail clothing and [petitioner] was the only person whose likeness had also been included in the photo lineup.

5   *Id.* at 124.  Petitioner argues that under the totality of the circumstances his identification by

6   witnesses Martinez, Caballero and Crane was not reliable.

7        In the traverse, petitioner states that the single photograph shown to these witnesses was in

8   the form of a Vacaville Police Dept. flyer, which is attached to the traverse.  ECF No. 18 at 11.

9   The flyer contains a photograph of a man entering a store, with the words "211 PC suspect"

10  written in bold at the top of the page.[11]  *Id.*  Petitioner argues that the flyer was "so impermissibly

11  suggestive that it caused defendant to stand out in a way that it would suggest the witness should

12  select him."  *Id.* at 6-7.  He points out that the state appellate court opined the showing of a single

13  photograph of petitioner to witnesses was "possibly" suggestive.  *Id.* at 6.

14       Petitioner also argues that the pretrial identification procedures used with witness Kerwin

15  were impermissibly suggestive.  ECF No. 17-9 at 126.  He notes that Kerwin identified him from

16  the photo lineup but chose a different person at a subsequent live lineup.  *Id.*  Two weeks later,

17  Kerwin was asked to come back to the police station to review a photograph of the live lineup

18  without petitioner or his representative being present.  *Id.*  Petitioner notes that no other witnesses

19  were asked to go to the police department after the photo and live lineups were conducted.  *Id.*

20  He argues it is likely Kerwin identified petitioner because he recognized him from the earlier

21  lineups.

22       In sum, petitioner argues, "[t]he identifications of [petitioner] by Martinez, Crane,

23  Caballero and Kerwin were not strong, and were not sufficiently reliable, considering the totality

24  of circumstances, to negate the taint caused by the unduly suggestive pre-trial identification

25  procedures."  *Id.* at 127.

26  /////

27

---

28  [11]  It is not clear whether these words were contained on the photograph shown to Martinez, Caballero and Crane.

1    **1. State Court Decision**

2    The California Court of Appeal rejected these arguments, reasoning as follows:

3        Prior to trial, appellant moved to exclude in-court identifications by
4    Martinez, Crane, Caballero and Kerwin on the grounds that
     identification by these witnesses had been tainted by unduly
     suggestive pretrial identification procedures.  The trial court denied
5    the motion, finding that appellant failed to meet his burden of
     showing that the procedures were unduly suggestive and
6    unnecessary or that the ultimate identification was not reliable.

7        Appellant now argues that his constitutional rights to due process
     and a fair trial were violated by the use of impermissibly suggestive
8    pretrial identification procedures.  His claim is based on the facts
     that the witnesses in the Sally's and Entenmann's robberies were
9    shown a surveillance photograph of the suspect in the Tommy
     Bahamas robbery before they identified appellant in photo and live
10   lineups; that appellant was the only subject included in both the
     photographic lineups and live lineups; and that one of the victims in
11   the Tommy Bahamas attempted robbery identified someone other
     than appellant in the live lineup, then later identified appellant in a
12   photograph of the live lineup after being requested to come to the
     police station.

13
     We apply the independent standard of review to a trial court's
14   determination that a pretrial identification procedure was not
     unduly suggestive. (*People v. Kennedy* (2005) 36 Cal.4th 595, 609,
15   *disapproved on other grounds* in *People v. Williams* (2010) 49
     Cal.4th 405, 459.)  "In order to determine whether the admission of
16   identification evidence violates a defendant's right to due process of
     law, we consider (1) whether the identification procedure was
17   unduly suggestive and unnecessary, and, if so, (2) whether the
     identification itself was nevertheless reliable under the totality of
18   the circumstances, taking into account such factors as the
     opportunity of the witness to view the suspect at the time of the
19   offense, the witness's degree of attention at the time of the offense,
     the accuracy of his or her prior description of the suspect, the level
20   of certainty demonstrated at the time of the identification, and the
     lapse of time between the offense and the identification. (*Manson
21   v. Brathwaite* (1977) 432 U.S. 98, 104–107, 114; *Neil v. Biggers*
     (1972) 409 U.S. 188, 199–200; *People v. Ochoa* [ (1998) ] 19
22   Cal.4th 353, 412; *People v. Johnson* (1992) 3 Cal.4th 1183, 1216;
     *People v. Gordon* (1990) 50 Cal.3d 1223, 1242.)   [¶]   The
23   defendant bears the burden of demonstrating the existence of an
     unreliable identification procedure. (*People v. Ochoa, supra*, 19
24   Cal.4th 353, 412; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)
     'The question is whether anything caused defendant to "stand out"
25   from the others in a way that would suggest the witness should
     select him.'  (*People v. Carpenter* (1997) 15 Cal.4th 312, 367.)"
26   (*People v. Cunningham* (2001) 25 Cal.4th 926, 989–990.)

27   Appellant argues that it is likely Martinez, the witness in the Sally's
     robbery, identified appellant at the lineups not because she
28   recognized him from the incident but because his face was familiar

24

from the surveillance photograph the police showed her.   He emphasizes that Martinez recognized the photo was from a surveillance camera, that she recognized the subject's build but not his face, and that the photograph depicts a man with a mustache while at the time of the robbery Martinez described the suspect as clean shaven.

Courts have noted the danger that a witness who first identifies a suspect from photographs may base a subsequent identification on the memory of the photograph rather than of the incident itself. (*Simmons v. United States* (1968) 390 U.S. 377, 383.)  Use of a single photograph for identification is particularly problematic because of the suggestion it conveys to the witness that the police believe the person in the photograph is the suspect.  (*People v. Contreras* (1993) 17 Cal.App.4th 813, 820; *see, Simmons, supra*, 390 U.S. at p. 383; *Manson v. Brathwaite, supra*, 432 U.S. at pp. 107–109.)

But photographic identifications play a critical role in criminal investigations.  As *Simmons* explained, "[d]espite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs.  The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." (*Simmons v. United States, supra*, 390 U.S. at p. 384.)  Identifications based on a single photograph may play a necessary and valid role in an investigation, and the fact that a witness first identified the defendant from a single photograph does not necessarily impermissibly taint a subsequent identification. (*People v. Johnson* (2010) 183 Cal.App.4th 253, 273; *Wilson v. Superior Court* (1977) 70 Cal.App.3d 751, 757; *People v. Greene* (1973) 34 Cal.App.3d 622, 644–645.)   "[E]ach case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons, supra*, 390 U.S. at p. 384.)

*People v. Johnson* is particularly apt.   There, police were investigating a series of robberies or attempted robberies of gas stations in the Sacramento area.  Still photographs taken from the video surveillance recording of one of these incidents were shown to the victim of an uncharged incident, and she recognized the subject in the photographs as the person who attempted to rob her. (*People v. Johnson, supra*, 183 Cal.App.4th at p. 271.)   She subsequently identified the defendant in a live lineup.  (*Ibid.*) Rejecting the contention that use of the photographs before the live lineup improperly tainted the witness's identification, the court first noted that because the photographs were not part of the record, it

did not know exactly what they depicted and therefore could not determine what prejudicial effect they could have had on the subsequent identification. (*Id.* at pp. 272–273.) The court then stated, "We certainly cannot say the procedure was unnecessary. A police sergeant from a different jurisdiction asked Mar to view the photos based on the similarity in the crimes and in order to solve the crime against Mar." (*Id.* at p. 273.)

In the present case, Vallejo Police Officer Polen circulated the surveillance photograph from the attempted robbery at Tommy Bahamas to other agencies, and Fairfield Police Officer Trojanowski showed the photograph to victims of robberies that occurred in his jurisdiction. There is nothing inherently suggestive about the photograph: It simply depicts a man walking into a clothing store, with the store door part way open behind him. Given the background of the photograph, it could not have been used in a photographic lineup because other photographs would necessarily have had different backgrounds.[12]  There is nothing unreasonable about Officer Trojanowski attempting to determine whether the attempted robbery suspect seen in the surveillance photograph was the same person responsible for the Fairfield robberies.

Appellant emphasizes that Martinez recognized the photograph she was shown as a surveillance photograph.  But this in itself is not suggestive.  The purpose of a surveillance camera aimed at a store's door is to capture images of persons entering and leaving the store; any customer visiting the store would be so documented. Appellant's description of Martinez having testified that she recognized the build of the person in the surveillance photograph but not his face overstates the testimony.  Martinez testified that she recognized the person's build and that she did not remember whether she recognized his face or did not recognize it.  Martinez did describe appellant to the police as clean-shaven while the surveillance photograph shows a man with a mustache, but this discrepancy is not sufficient to conclude the surveillance photograph was unduly suggestive.  The other discrepancies that appellant notes are that Martinez described the suspect as five foot nine inches tall and about 40 years old, while appellant was "about" six feet tall and 51 years old.  Neither of these is so far off as to undermine the reliability of the identification.  Rather, these were the kind of factors the jury was instructed to consider in determining the credibility of eyewitness testimony.  (CALCRIM No. 31510; *see Wilson v. Superior Court, supra*, 70 Cal.App.3d at p. 757 [discrepancy between witness estimate of height (five feet six inches) and actual height (six feet two inches) "may cast doubt on the victim's credibility and the defense can rightly draw a jury's attention to them"].)

---

[12]   Officer Trojanowski testified that in preparing a photographic lineup, he tries to make the photographs as similar as possible in terms of factors such as age, race, skin tone and background. (RT 290).  When he prepared the photographic lineup he used in this case, he did not use the surveillance photograph because the background would have been different from other photos. (RT 290).

26

Martinez had ample opportunity to observe appellant at the time of the robbery. She testified that the store was well lit, and she talked to him first from about six feet away and then, upon his return, from across the counter at the register. Although she looked down once she realized a robbery was underway, she and appellant initially were looking straight at each other. There is no basis for us to conclude her identifications from the photographic lineup, live lineup and at trial were not reliable.

With respect to the witnesses in the Entenmann's robbery, Caballero and Crane, appellant notes that neither was able to positively identify the suspect from the photographic lineup, indicating only that appellant "could be" the robber but they were "not a hundred percent sure"; that appellant was the only person included in both the photographic and live lineup, and that all the subjects in the live lineup were wearing jail jump suits. He further points to Cabellero's description of the suspect as about 30 years old, 20 years younger than appellant's actual age; her testimony that she did not realize appellant was bald until she saw him at the live lineup; and the facts that Crane was not wearing her glasses at the time of the robbery and told the 911 operator first that the Band Aid on the suspect's face was above his eye, then that it was below his eye.

Again, the discrepancies to which appellant points were factors for the jury's consideration, and the defense emphasized these and other similar points on cross-examination and in closing argument. "[T]he fact that defendant alone appeared in both a photo lineup and a subsequent live lineup does not per se violate due process." (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.) A defendant bears the burden of showing that an identification procedure was unduly suggestive and unfair "as a demonstrable reality, not just speculation." (*People v. DeSantis, supra*, 2 Cal.4th at p. 1222.) As indicated above, due process is violated "only if the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" (*People v. Cook*, at p. 1355, quoting *Simmons v. United States, supra*, 390 U.S. at p. 384.)

In arguing that the subsequent identifications were tainted by the witnesses first being shown the surveillance photograph, appellant attempts to distinguish *People v. Hernandez* (1988) 204 Cal.App.3d 639 (*Hernandez*), a case rejecting such a challenge. In *Hernandez*, the witness was first shown a photographic lineup that did not include the defendant's photograph and did not identify anyone. He was later shown another photographic lineup and stated that the defendant's photograph looked "more like" the burglar than any of the others. The detective, informed that the burglar was wearing a cap, showed the witness a single photograph of the defendant wearing a hat. The witness still did not make a positive identification because "'he had his hands up in front of his face and [the witness] couldn't get a good look at his face.'" (*Id.* at pp. 644–645.) The witness identified the defendant at trial. (*Id.* at p. 653.)

Upholding the trial court's denial of the motion to suppress the in-court identification as the product of an unfair pretrial identification

procedure, *Hernandez* noted that the police did not initiate the identification procedure by showing a single photograph but showed it only after the witness pointed to the defendant's photograph in a lineup as most resembling the burglar, and that even with the single photograph, the identification was only tentative, "indicating that the showing of the single photo of defendant had no effect." (*Hernandez, supra,* 204 Cal.App.3d at pp. 653–654.)  Appellant argues that the present case is different because the police used the single photograph at the beginning of the identification procedure, and the witnesses' subsequent identifications were not tentative.  While the distinctions appellant notes are accurate, they do not undermine our conclusion that appellant has not demonstrated that the use of the single photograph in this case was unduly suggestive or the subsequent identifications were unreliable.

*Bazemore*, 2013 WL 3778353, at **12-15.

## 2. **Applicable Law**

The Due Process Clause of the United States Constitution prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification."  *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 326 (1987).  *See also Boyer v. Chappell*, 793 F.3d 1092, 1100 (9th Cir.  2015).  A suggestive identification violates due process if it was unnecessary or "gratuitous" under the circumstances.  *Neil v. Biggers*, 409 U.S. 188, 198 (1972).  An identification procedure is suggestive where it "[i]n effect . . . sa[ys] to the witness 'This is the man.'"  *Foster v. California*, 394 U.S. 440, 443 (1969).  "[E]ach case must be considered on its own facts" and whether due process has been violated depends on "the totality of the surrounding circumstances."  *Simmons v. United States*, 390 U.S. 377, 383 (1968) (citing *Stovall*, 388 U.S. at 302).

In *Perry v. New Hampshire*, 565 ___ U.S. ___, 132 S.Ct. 716 (2012), the United States Supreme Court clarified that due process bars admission only of unreliable identifications arising from "improper law enforcement activity."  *Id.* at 720–21 (listing instances of improper police activity, such as rigging a lineup, showup, or photo six-pack).  Case law makes clear that "what triggers due process concerns is police use of an unnecessarily suggestive identification procedure, whether or not they intended the arranged procedure to be suggestive."  *Id.* at 721 n.1.  However, "even when the police use [a suggestive identification] procedure, suppression of the

1   resulting identification is not the inevitable consequence." *Id.* at 719.  Courts must assess each

2   case to determine whether improper police conduct created a "substantial likelihood of

3   misidentification." *Biggers*, 409 U.S. at 201.  "Where the 'indicators of [a witness'] ability to

4   make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement

5   suggestion, the identification should be suppressed." *Perry*, 132 S. Ct. at 719 (quoting *Manson v.*

6   *Brathwaite*, 432 U.S. 98, 114, 116 (1977)).

7        Factors indicating the reliability of an identification include:  (1) the opportunity to view

8   the criminal at the time of the crime; (2) the witness' degree of attention (including any police

9   training); (3) the accuracy of the prior description; (4) the witness's level of certainty at the

10  confrontation; and (5) the length of time between the crime and the identification. *Brathwaite*,

11  432 U.S. at 114 (citing *Biggers*, 409 U.S. at 199-200).  Additional factors to be considered in

12  making this determination are "the prior opportunity to observe the alleged criminal act, the

13  existence of any discrepancy between any pre-lineup description and the defendant's actual

14  description, any identification prior to lineup of another person, the identification by picture of

15  the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the

16  lapse of time between the alleged act and the lineup identification." *United States v. Wade*, 388

17  U.S. 218, 241 (1967).  The "central question," is "whether under the 'totality of the

18  circumstances' the identification is reliable even though the confrontation procedure was

19  suggestive." *Biggers*, 409 U.S. at 199.  *See also United States v. Drake*, 543 F.3d 1080, 1088

20  (9th Cir. 2008).

21       If the flaws in the pretrial identification procedures are not so suggestive as to violate due

22  process, "the reliability of properly admitted eyewitness identification, like the credibility of the

23  other parts of the prosecution's case is a matter for the jury." *Perry*, 132 S. Ct. at 719; *Foster*,

24  394 U.S. at 443 n.2.  Absent improper law enforcement activity, "it suffices to test reliability

25  through the rights and opportunities generally designed for that purpose," such as "vigorous

26  cross-examination, protective rules of evidence, and jury instructions on both the fallibility of

27  eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt."

28  *Perry*, 132 S.Ct. at 721, 727 (noting that "[m]ost eyewitness identifications involve some element

1   of suggestion," as "all in-court identifications do"). *See also Brathwaite*, 432 U.S. at 116

2   ("[j]uries are not so susceptible that they cannot measure intelligently the weight of identification

3   testimony that has some questionable feature"); *United States v. Jones*, 84 F.3d 1206, 1210 (9th

4   Cir. 1996) (unless the procedure used is so suggestive that it raises a "very substantial likelihood

5   of irreparable misidentification," doubts go to the weight, not the admissibility, of the evidence

6   and "identification evidence is for the jury to weigh") (quoting *United States v. Kessler*, 692 F.2d

7   584, 586-87 (9th Cir. 1982)).  On the other hand, if an out-of-court identification is inadmissible

8   due to unconstitutionality, a related in-court identification is also inadmissible unless the

9   government establishes that it is reliable by introducing "clear and convincing evidence that the

10  in-court identifications were based upon observations of the suspect other than the lineup

11  identification." *Wade*, 388 U.S. at 240.  *See also United States v. Hamilton*, 469 F.2d 880, 883

12  (9th Cir. 1972) (in-court identification admissible, notwithstanding inherent suggestiveness,

13  where it was obviously reliable).  Under the harmless error standard, a court must determine

14  whether a constitutional error "'had substantial and injurious effect or influence in determining

15  the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted).[13]

16              **3. Analysis**

17          Assuming *arguendo* that the pretrial identification procedures used in this case were

18  impermissibly suggestive, the court concludes that the in-court identifications were nonetheless

19  reliable because they were not likely to yield an "irreparable misidentification." *Manson*, 432

20  U.S. at 116 (internal quotation and citation omitted).

21  _____

22          [13]  Under California law, an extrajudicial identification violates a defendant's right to due
    process only if the identification procedure was unduly suggestive and unnecessary, and the

23  identification itself, under the totality of the circumstances, was unreliable.  *People v. Carpenter*,
    15 Cal.4th 312, 366-367 (1997).  The defendant has the burden of showing the identification

24  procedure was unfair "as a demonstrable reality, not just speculation."  *People v. DeSantis*, 2
    Cal.4th 1198, 1222 (1992).  *See also People v. Ochoa*, 19 Cal.4th 353, 412 (1998).  If the

25  challenged procedure is not impermissibly suggestive, the reviewing court's inquiry into the due
    process claim ends.  *Ochoa*, 19 Cal.4th at 412; *DeSantis*, 2 Cal.4th at 1224 n.8.  The crucial

26  question under California law is whether the defendant was singled out from the others in such a
    way that his identification was a foregone conclusion under the circumstances.  *People v.*

27  *Faulkner*, 28 Cal.App.3d 384, 391 (1972) *disapproved on other grounds* in *People v. Hall*, 28
    Cal.3d 143, 156, fn.8 (1980) and *People v. Bustamonte*, 30 Cal.3d 88, 102 (1981)).

28

Rosa Martinez had ample opportunity to observe the robber. She testified that the robber came into the store a couple of times. ECF No. 17-6 at 166-67. He told her he was waiting for his wife to come in, walked around the store, and left. *Id.* at 167. He returned to the store approximately 30 minutes later. *Id.* Apparently recognizing the man, Martinez asked him whether his wife had come back and he responded that she was not coming in. *Id.* at 168. He grabbed a brush, walked to the register, and told Martinez he was there to rob her. *Id.* at 167-68. As related by the California Court of Appeal, the store was well lit, Martinez had several conversations with the robber, she was only about six feet away from him during the first conversation and only a few feet away during the second conversation, and she was looking straight at him. *Id.* at 171-72.

Martinez's description of the robber to the police matched petitioner's description in several particulars, including the Band-Aid on his face. *Id.* at 180, 187-88. She identified petitioner in the courtroom without hesitation. *Id.* at 166. She also identified petitioner as the robber after seeing his photograph shortly after the robbery, at a later photo lineup, and at a live lineup. *Id.* at 180. Martinez was cross-examined extensively on her identification of petitioner as the robber. *Id.* at 181-90.

Carol Crane testified without hesitation that petitioner was the person who committed a robbery at the Entenmann's Bakery. *Id.* at 271. He was the only customer in the store at that time. *Id.* at 272. She described in detail from memory the robber's movements, actions, and statements after he entered the store. *Id.* at 272-77. Although she did not look at the robber for a long time, she was only a short distance from him, was facing him, and paid particular attention to him because he had a Band-Aid on his face. *Id.* at 273. She saw his face clearly and when he told her he was armed, she looked at him "face on." *Id.* at 273, 277. The store was well lit during these events. *Id.* at 273. Crane was also cross-examined about her ability to identify petitioner as the robber. *Id.* at 285-86.

Natalie Caballero also testified without hesitation that petitioner was the person who robbed the Entenmann's store. *Id.* at 250, 264. She was able to describe in detail the robber's movements, appearance, and statements after he entered the store. *Id.* at 250-56. She was the

1   employee who waited on the robber.  *Id.* at 251-52.  The robber asked her about some of the

2   merchandise while Caballero was standing approximately an arm's length from him.  *Id.* at 252.

3   Caballero also remembered that the robber had a Band-Aid on his face.  *Id.* at 259.  Caballero was

4   thoroughly cross-examined about her ability to identify petitioner as the robber.  *Id.* at 265-67.

5          Sean Kerwin testified without hesitation that petitioner was the person who robbed the

6   Tommy Bahama store.  *Id.* at 195.  He also described in detail the events surrounding that

7   robbery, including the robber's description, actions, and statements.  *Id.* at 196, *et seq*.  Kerwin

8   talked to the robber "eye to eye or face to face."  It was "pretty bright" in the store and he could

9   see the robber easily.  *Id.* at 201-02.  He identified the robber from a photographic lineup after

10  having seen a surveillance photo of the robber that his corporate office had sent.  *Id.* at 202-03.

11  As noted by the California Court of Appeal, Kerwin originally identified someone other than

12  petitioner at a live lineup, but later identified petitioner after seeing a photograph of the live

13  lineup he had previously seen.

14         All of the victims' descriptions of the robber to the police shortly after the robberies

15  occurred were reasonably accurate.  All of them had ample opportunity to view the robber at

16  close range for at least several minutes and engaged in short conversations with him.  They all

17  agreed that petitioner was the person who had robbed them.  They all identified petitioner at trial

18  without apparent hesitation.  It appears from the testimony of these victims that their in-court

19  identification of petitioner was based on their memory of the robber at the time of the crimes and

20  not on the out-of-court identifications.  Under the "totality of the circumstances," this court

21  concludes that the in-court identifications of witnesses Crane, Martinez, Caballero and Kerwin

22  were reliable.  Any discrepancies between petitioner's actual appearance and the descriptions of

23  the robber given by these witnesses to the police were thoroughly explored during cross-

24  examination, as were all other possible weaknesses in their testimony.  In this case, the indicators

25  of the witnesses' ability to make an accurate identification are not "outweighed by the corrupting

26  effect" of law enforcement suggestion.  *Perry*, 132 S. Ct. at 719.

27  /////

28  /////

Because the in-court identifications of petitioner by the witnesses were not unreliable, petitioner is not entitled to relief on his challenges to the victims' identification of him as the perpetrator of the robberies.  The decision of the California Court of Appeal to the same effect is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Accordingly, petitioner is not entitled to federal habeas relief.

### C.  Ineffective Assistance of Counsel

Petitioner claims that his trial counsel rendered ineffective assistance in failing to investigate and present an alibi defense for the Fallas Paredes robbery and in failing to challenge the application of the Three Strikes Law to his case.  After setting forth the applicable legal principles, the court will evaluate these claims in turn below.

### 1.  Applicable Legal Standards

The applicable legal standards for a claim of ineffective assistance of counsel are set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687.  Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-88 (quoting *Strickland*, 466 U.S. at 687).

A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669; *see Richter*, 131 S.Ct. at 789.  Reviewing courts must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel

33

1  may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011)

2  (internal quotation marks and alterations omitted).

3        Defense counsel has a "duty to make reasonable investigations or to make a reasonable

4  decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  Counsel

5  must, "at a minimum, conduct a reasonable investigation enabling him to make informed

6  decisions about how best to represent his client." *Hendricks v. Calderon*, 70 F.3d 1032, 1035 (9th

7  Cir. 1995) (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and

8  quotations omitted).  *See also Porter v. McCollum*, 558 U.S. 30, 40 (2009) (counsel's failure to

9  take "even the first step of interviewing witnesses or requesting records" and ignoring "pertinent

10  avenues for investigation of which he should have been aware" constituted deficient

11  performance).  "A lawyer who fails adequately to investigate, and to introduce into evidence,

12  records that demonstrate his client's factual innocence, or that raise sufficient doubt as to that

13  question to undermine confidence in the verdict, renders deficient performance." *Vaga v. Ryan*,

14  735 F.3d 1093, 1096-97 (9th Cir. 2013) (quoting *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir.

15  1999)).

16        On the other hand, where an attorney has consciously decided not to conduct further

17  investigation because of reasonable tactical evaluations, his or her performance is not

18  constitutionally deficient.  *See Siripongs v. Calderon*, 133 F.3d 732, 734 (9th Cir. 1998)

19  (*Siripongs II*); *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998); *Hensley v. Crist*, 67

20  F.3d 181, 185 (9th Cir. 1995).  "A decision not to investigate thus 'must be directly assessed for

21  reasonableness in all the circumstances.'"  *Wiggins v. Smith*, 539 U.S. 510, 533 (200) (quoting

22  *Strickland*, 466 U.S. at 691).  Furthermore, "'ineffective assistance claims based on a duty to

23  investigate must be considered in light of the strength of the government's case.'"  *Bragg v.*

24  *Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (quoting *Eggleston v. United States*, 798 F.2d 374,

25  376 (9th Cir. 1986)).  *See also Rhoades v. Henry*, 638 F.3d 1027, 1036 (9th Cir. 2011) (counsel

26  did not render ineffective assistance in failing to investigate or raise an argument on appeal where

27  "neither would have gone anywhere").

28  /////

34

1    Prejudice is found where "there is a reasonable probability that, but for counsel's

2    unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

3    U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

4    outcome." *Id.*  "The likelihood of a different result must be substantial, not just conceivable."

5    *Richter*, 131 S.Ct. at 792.  A reviewing court "need not first determine whether counsel's

6    performance was deficient before examining the prejudice suffered by the defendant as a result of

7    the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

8    lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

9    Under AEDPA, "[t]he pivotal question is whether the state court's application of the

10   *Strickland* standard was unreasonable." *Id.* at 785.  "[B]ecause the *Strickland* standard is a

11   general standard, a state court has even more latitude to reasonably determine that a defendant has

12   not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

13                    **2. <u>Alibi Defense</u>**

14   In his third ground for relief, petitioner claims that his trial counsel rendered ineffective

15   assistance in failing to thoroughly investigate an alibi for the robbery committed on March 4,

16   2008 at the Fallas Paredes clothing store in Vacaville, California.  ECF No. 1 at 28.  Petitioner

17   explains that he was out of the state at the time of the robbery attending his stepson's basketball

18   game and that he gave his trial counsel "witnesses and documentation that enabled her to obtain

19   evidence of time, date, and places that would prove and corroborate defendant's alibi."  That

20   evidence includes: (1) pictures obtained "from the internet" showing defendant attending his

21   stepson's basketball game in Seattle, Washington; (2) rental car receipts showing the rental and

22   return of a rental car on the relevant dates; and (3) "interviews of witnesses by counsel's

23   investigator." *Id.*  Petitioner also alleges his trial counsel failed to investigate information that he

24   was stopped by an Oregon police officer during his return back to California "which would have

25   provided a documented time, date, and place that would have corroborated defendant's alibi." *Id.*

26   He argues that all of this evidence would have proved that he did not commit the robbery at the

27   Fallas Paredes store on March 4, 2008. *Id.* at 29.  Petitioner also states that his trial counsel told

28   /////

1   him she couldn't continue with her investigation into petitioner's alibi because her investigator

2   had to take time off for surgery.  *Id.* at 29.

3       In support of these allegations, petitioner has attached two defense investigation reports.

4   The first report describes an interview with petitioner's brother Raymond Bazemore wherein Mr.

5   Bazemore stated that he used his credit card to rent a car for petitioner between 6:00 a.m. on

6   February 27, 2008 until 6:00 a.m. on March 5, 2008, so that petitioner could drive to Seattle to

7   watch his stepson play in a college basketball game.  *Id.* at 32.  Mr. Bazemore stated he did not

8   see petitioner between the time he rented the car and the time he met him to return the car.  *Id.*

9       The second defense investigative report describes an interview with petitioner's wife,

10  wherein she states that she accompanied petitioner to the Sacramento Airport to meet Raymond

11  Bazemore at a car rental agency and that she, petitioner, and a friend of her son drove to Seattle to

12  watch her son play basketball.  Mrs. Bazemore further explains that petitioner returned the rental

13  car to the Sacramento Airport on Wednesday morning.  Although this report does not contain the

14  dates the described events occurred, petitioner has added handwritten notations on the report

15  indicating that the rental car was returned to the Sacramento Airport on the morning of March 5,

16  2008, and that petitioner returned home from Seattle at approximately 12:00 a.m. on March 4,

17  2008.  *Id.* at 33.[14]

18      Petitioner raised this claim in a petition for writ of habeas corpus filed in the California

19  Supreme Court.  The Supreme Court denied the petition with citations to *In re Clark*, 5 Cal.4th

20  750, 767-69 (1993) (the court will not consider repetitious, piecemeal, or  delayed claims) and

21  *People v. Duvall*, 9 Cal.4th 464, 474 (1995) (vague and conclusory claims that do warrant habeas

22  relief will be dismissed).  *Id.* at 34.

23      Petitioner has failed to demonstrate prejudice with respect to this claim; i.e., that the result

24  of the proceedings would have been different if his trial counsel had investigated an alibi defense

25  with respect to the Fallas Paredes store.  Petitioner has not provided copies of the pictures

26  _____

27      [14]   In his habeas petition filed in the California Superior Court, petitioner's handwritten
    notation reflected that he arrived home from Seattle at approximately 12:00 *p.m.* on March 4,
    2008.  ECF No. 17-9 at 11.  In the petition filed in this court, petitioner has crossed out "p.m."

28  and written "a.m." above it.

obtained "from the internet" showing defendant attending his stepson's basketball game in

Seattle, Washington; rental car receipts showing the rental and return of a rental car on the

relevant dates; or any proof that he was stopped by a state trooper on the way home from

Seattle.[15]  The declaration of petitioner's brother reflects that he did not see petitioner between the

time he rented the car on February 27, 2008 and the time he met him to return the car on March 5,

2008, after the robbery had taken place.  Further, regardless of whether petitioner's handwritten

notations at the bottom of the investigation report describing the defense investigator's interview

with petitioner's wife are accurate, the latest time petitioner returned from Seattle was 12:00 p.m.

on March 4, 2008, which would have left him time to commit the robbery at the Fallas Paredes

store on 7:20 p.m. on March 4.  Under these circumstances, petitioner has failed to show his trial

counsel would have presented or prevailed on an alibi defense with respect to this robbery

The court also notes that petitioner's trial counsel was in possession of the investigative

reports described above but chose, apparently for a tactical reason, not to pursue an alibi defense.

Reasonable tactical decisions, including decisions with regard to the presentation of the case, are

"virtually unchallengeable."  *Strickland*, 466 U.S. at 687-90.  Because petitioner has failed to

show either deficient performance or prejudice with respect to this claim, he is not entitled to

federal habeas relief.

### 3.  Three Strikes Law

In his final ground for relief, petitioner claims that his trial counsel rendered ineffective

assistance in failing to challenge the application of California's Three Strikes Law to his sentence.

ECF No. 1 at 38-42.  He explains that his trial counsel for the 2000 robbery case rendered

ineffective assistance in giving him incorrect advice about the consequences of his guilty plea in

the event of a future conviction.  Trial counsel in the 2000 case apparently advised petitioner

when he pled guilty that his conviction could result in only a one to five year enhancement to his

sentence in the event of a future conviction.  *Id.* at 38.  Instead, as described above, petitioner's

---

[15]  In his traverse, petitioner states that his trial counsel had the car rental agreement in her possession but chose not to present it at trial "for whatever reasons that were never made clear to petitioner."  ECF No. 18 at 8.

prior conviction was found to be a "strike" and contributed to petitioner's lengthy sentence under

the Three Strikes Law.  In his claim before this court, petitioner is apparently arguing that his trial

counsel in this case rendered ineffective assistance in failing to challenge the use of his prior

conviction as a "strike" on the grounds that his trial counsel in 2000 rendered ineffective

assistance in failing to inform him of the consequences of his plea.

Petitioner raised this claim in the California Superior Court.  ECF No 17-8.  The Superior

Court denied the claim, reasoning as follows:

> In this petition, Petitioner contends that his robbery conviction in FCR181404 from 2000 was improperly used against him as a strike in [the instant case].  He seems to be claiming that his attorney in FCR 181404 performed deficiently (IAC) by failing to inform him of the strike consequences of his plea, thus rendering his conviction in FCR 181404 invalid.  He also claims that his attorney in [the instant case] committed IAC by failing to challenge the application of the Three Strikes Law on this ground.

> Successive, delayed and piecemeal presentations of habeas claims constitute an abuse of the writ.  (*In re Clark* (1993) 5 Cal.4th 750, 769-70; *In re Reno* (Aug. 30, 2012, S124660) --- Cal. 4th --- [p. 29].)  Petitioner filed a habeas petition (case No. FCR 289524) on December 8, 2011 with this Court attacking the validity of his conviction in [the instant case] on various grounds, including IAC.  Petitioner offers no justification for why the claims raised in this petition were not raised in his December 8, 2011 habeas petition, nor does he offer any justification for his delay in raising these claims.  (*Clark, supra*, 5 Cal.4th at pp. 774 & 786-87; *Reno, supra*, --- Cal. 4th_--- [p. 29].)

> Even if Petitioner's claims were properly before the Court, Petitioner fails to state a prima facie case for relief.  (*People v. Duvall* (1995) 9 Cal.4th 464, 475.)

> First, Petitioner claims that his attorney in FCR 181404 committed IAC by failing to inform him of the strike consequences of his plea.  However, Petitioner does not set forth any evidence to support that counsel in FCF 181404 failed to advise him that his conviction in that case could be used as a strike in the future.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)  Petitioner also cites no authority to support that counsel's failure to advise him of the potential strike consequences of his plea, a collateral consequence, constitutes ineffective assistance.  (*See People v. Gurule* (2002) 28 Cal.4th 557, 634; *People v. Bernal* (1994) 22 Cal.App.4th 1455, 1457; *People v. Crosby* (1992) 3 Cal.App.4th 1352, 1355; *People v. Sipe* (1995) 36 Cal.App.4th 468, 479; *see also People v. Reed* (1998) 62 Cal.App.4th 593, 597 & 601 ("[A]n attorney's failure to inform his or her client of the collateral consequences of [a] plea does not constitute incompetent representation under the *Strickland* criteria.").)

38

1

2

3

4

> Additionally, Petitioner presents no evidence whatsoever to establish prejudice, i.e. that he would have insisted on going to trial in FCR 181404 had counsel in that case advised him of the strike consequences of his conviction. (*Strickland, supra*, 466 U.S. at p. 687.) Petitioner fails to offer any evidence showing that he was innocent or had some sort of defense to the charges in FCR 181404.

5

6

7

> Second, Petitioner fails to state a prima facie case for relief with regard to his claim that his attorney in [the instant case] committed IAC by failing to challenge the use of his conviction in FCR 181404 as a strike on the aforementioned grounds. (*Duvall, supra*, 9 Cal.4th at p. 475.) Petitioner has not shown that there is any valid basis for attacking the validity of his conviction in FCR 181404 based on IAC or any other ground.

8

> This petition for writ of habeas corpus is DENIED.

9

10     *Id.* at 7-9.

11     Petitioner subsequently raised this claim in the California Court of Appeal, which

12     summarily denied relief after soliciting a responsive brief from the state. ECF No. 17-9 at 39 -

13     81. Petitioner next raised the claim in a petition for writ of habeas corpus filed in the California

14     Supreme Court. *Id.* at 177. The Supreme Court denied that petition with a citation to *In re Clark*,

15     5 Cal.4th 750, 767-79 (1993). *Id.* at 199.

16     Respondent argues that the California Supreme Court's citation to *In re Clark* constitutes

17     a state procedural bar which precludes this court from addressing the merits of this ineffective

18     assistance claim. ECF No. 16-1 at 17-18. As a general rule, "[a] federal habeas court will not

19     review a claim rejected by a state court 'if the decision of [the state] court rests on a state law

20     ground that is independent of the federal question and adequate to support the judgment." *Walker*

21     *v. Martin*, 562 U.S. 307, 314 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53 (2009). However, a

22     reviewing court need not invariably resolve the question of procedural default prior to ruling on

23     the merits of a claim. *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997); *see also Franklin v.*

24     *Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002): ("Procedural bar issues are not infrequently more

25     complex than the merits issues presented by the appeal, so it may well make sense in some

26     instances to proceed to the merits if the result will be the same"); *Busby v. Dretke*, 359 F.3d 708,

27     720 (5th Cir. 2004) (noting that although the question of procedural default should ordinarily be

28     considered first, a reviewing court need not do so invariably, especially when the issue turns on

1   difficult questions of state law).  Where deciding the merits of a claim proves to be less

2   complicated and less time-consuming than adjudicating the issue of procedural default, a court

3   may exercise discretion in its management of the case to reject the claim on the merits and forgo

4   an analysis of procedural default.  *See Franklin*, 290 F.3d at 1232 (citing *Lambrix*, 520 U.S. at

5   525).  Under the circumstances presented here, the court finds that petitioner's claim can be

6   resolved more easily by addressing it on the merits.  Accordingly, the court will assume that the

7   claim is not defaulted.

8          Petitioner's claim that his trial counsel rendered ineffective assistance at the sentencing

9   hearing should be rejected.  The *Strickland* standards apply in the context of noncapital

10  sentencing proceedings.  *Daire v. Lattimore*, No. 12-55667 (9th Cir. Feb. 9, 2016.)  *See also*

11  *Glover v. United States*, 531 U.S. 198, 202-04 (2001); *Lafler v. Cooper*, 132 S.Ct. 1372, 1385-86

12  (2012).  However, petitioner has failed to demonstrate deficient performance or prejudice with

13  respect to this claim.  As respondent points out, under California law "a criminal defendant may

14  not challenge a prior conviction on the ground of ineffective assistance of counsel in the course of

15  a current prosecution for a noncapital offense."  *Garcia v. Superior* Court, 14 Cal.4th 953, 956

16  (1997).  Petitioner's trial counsel did not render deficient performance in failing to make an

17  argument that was improper under California law.  Petitioner has also failed to provide sufficient

18  support for his conclusory claim that his trial counsel in 2000 incorrectly advised him about the

19  possible future consequences of his plea of guilty in that case, or that petitioner would have

20  rejected the plea offer and proceeded to trial if he had been correctly advised.  Accordingly, there

21  is no evidence that petitioner was prejudiced by his trial counsel's failure to make the sentencing

22  argument he now suggests.[16]

23         For the foregoing reasons, petitioner is not entitled to federal habeas relief on this claim.

24  /////

25

26     [16]   Any claim that petitioner's trial counsel in his 2000 criminal case rendered ineffective
    assistance is not cognizable in this proceeding.  As a general rule, if a prior conviction used to
27  enhance a state sentence is fully expired in its own right, the defendant may not collaterally attack
    his prior conviction through a § 2254 petition.  *Lackawanna County District Attorney v. Coss*,
28  532 U.S. 394, 403-04 (2001).

**IV. Conclusion**

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  July 26, 2016.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE